UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CRAIG MICHAEL HASKELL, #468699,

        Petitioner,

v.                                Case No. 2:07-CV-11679
                                Honorable George Caram Steeh

MARY BERGHUIS,

        Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING IN PART A CERTIFICATE OF APPEALABILITY

      Petitioner, Craig Michael Haskell, is a state inmate currently incarcerated at Richard A. Handlon Correctional Facility in Ionia, Michigan. On August 15, 2003, a jury in Livingston County, Michigan, found Petitioner guilty[1] of four counts of first-degree criminal sexual conduct ("CSC"), Mich. Comp. Laws §750.520b(1)(f), one count of second-degree CSC, Mich. Comp. Laws §750.520c(1)(f), and aggravated domestic violence, Mich. Comp. Laws §750.81a(2), for beating and sexually assaulting his former girlfriend. Petitioner was sentenced to concurrent terms of twelve to thirty years for each count of the first-degree CSC convictions, ten to fifteen years for the second-degree CSC offense, and one year in Livingston County Jail for the aggravated domestic violence conviction. He filed a petition, through counsel, for a writ of habeas corpus under 28 U.S.C. §2254. For the reasons stated below, the Court will deny habeas relief and grant, in part, a certificate of appealability.

## I. BACKGROUND

      The convictions arose from Rae Russell's allegations that Petitioner sexually

---

[1]The jury found that Petitioner was "guilty but mentally ill." (Sent. Tr., 10/2/03 at 32). Thus, the jury did not find Petitioner satisfied the conditions necessary to establish the legal defense of insanity.

assaulted her on the evening of May 17, 2002. Ms. Russell was a former girlfriend of Petitioner, and was nineteen years of age at the time. It is undisputed that Petitioner visited Ms. Russell on that evening and that she was physically assaulted by Petitioner. However, Petitioner asserts that he struck Ms. Russell in the face while he was experiencing a seizure. (Pet. at 6). He denies that he sexually assaulted Ms. Russell or that he threatened her with a pair of scissors. *Id.*

Ms. Russell testified that she and Petitioner dated in high school over a two year period. (Trial Tr., Vol. I at 186). While they were both attending different colleges, their relationship ended in the fall of 2001. *Id.* at 187. Petitioner was facing some family, school, and job related challenges and reached out to Ms. Russell in an effort to reconcile. *Id.* at 188-90. Petitioner expressed his suicidal thoughts to Ms. Russell. *Id.* at 117, 220-21, 227, 231. A few days later on May 17, 2002, Petitioner went to Ms. Russell's home, where she lived with her parents, at about 7:30 p.m. *Id.* at 191.

Ms. Russell further testified that the two rented a movie and were watching a television sitcom before the movie when Petitioner became angry that Ms. Russell would not sit with him. *Id.* at 191-92, 222, 228. Petitioner began to cry, started talking about killing himself, said "mean things" to her, and threatened to send derogatory notes to her father. *Id.* at 192-93. Ms. Russell tried to console him when his demeanor completely changed. *Id.* at 225-26, 242. Ms. Russell stated that Petitioner was not his normal self and at that point he: (1) punched her in the left eye; (2) hit her in the head and slammed her head against a dresser; (3) put his hands around her throat and then one hand down her throat to keep her quiet; (4) threatened to kill her family if she made any noise; (5) continued to hit her; (6) disrobed her; (7) called her a whore; (8) digitally penetrated her; (9) had sexual intercourse with her; and (10) threatened her with a pair of scissors. *Id.* at 196-202.

Ms. Russell also testified that she begged Petitioner to stop, but he did not seem to hear her. *Id.* at 202. Suddenly, however, Petitioner appeared to "snap out of it" and he stopped. *Id.* at 245; Vol. II at 51. Again, Petitioner's temperament changed; he was shaking, apologetic, and repeatedly said "what have I done?" (Trial Tr., Vol. I at 245, 247; Vol. II at 51). Ms. Russell told Petitioner to go home and to get help from his parents. (Trial Tr., Vol. I at 103-04, 239, 246). Ms. Russell testified that, before this incident, Petitioner had never forced himself upon her, threatened her or her family, or assaulted her during their relationship. *Id.* at 224.

Janice Haskell, Petitioner's mother, testified that when he came home from college for Easter break, he "seemed different," (i.e., tired, not sleeping well, weight loss, etc.) (Trial Tr., Vol. II at 186). Also according to Ms. Haskell's testimony, Petitioner came directly home after he left Ms. Russell's home and told her that he hit Ms. Russell and was very distraught (i.e., pacing, holding his head, acting frantic and confused, crying, asking for help, etc.). *Id.* at 209-10. Ms. Haskell took Petitioner to the Psychiatric Emergency Room at the University of Michigan Hospital, where he stayed for ten days in the psychiatric unit under the treatment of Dr. Kenneth Pitts. When Petitioner was discharged, his tentative diagnosis was psychosis NOS, or "not otherwise specified." (Trial Tr., Vol. III at 90).

In Ms. Russell's initial statement to the police, she stated in part as follows:

He had been having some school and family problems and needed to talk them out with me. When I couldn't help him he didn't want him back . . . when I couldn't help him and didn't want him back he hit me four or five times in the head. Then he muffled my screams then he felt bad and I told him to leave and he left out the front door.

(Trial Tr., Vol. II at 20). Ms. Russell did not indicate to the police that she was sexually assaulted, threatened with scissors, or that Petitioner put his hand/fist down her throat

while she was being violently raped. (*Id.* at 20-21). While at the Emergency Room on the evening of the assault: (1) Ms. Russell denied being sexually assaulted; (2) she denied that she had sexual relations that evening; (3) there was no evidence of tenderness around her neck area; (4) there were no fingerprint marks around her neck; and (5) no sperm or seminal fluid was found on any of Ms. Russell's clothing or on any swabbed areas. (Trial Tr., Vol. II at 47, 126-27, 144).

However, the following day, after Ms. Russell's mother, Diane Russell, confronted her about blood in her underwear, Ms. Russell told her mother that she had been sexually assaulted. (Trial Tr., Vol. I, at 206 & Vol. II at 36, 67 & 82). Subsequently, the police were called back, another statement was made to the police, and Ms. Russell went back to the hospital, submitting to a rape examination. (Trial Tr., Vol. I at 207 & Vol. II at 67-68). In Ms. Russell's second statement to the police, she indicated that Petitioner threatened her with scissors by holding them to her throat, and that he put his hands down her throat. (Trial Tr., Vol. I at 233, 236). Dr. Ramstack, the emergency room doctor who examined Ms. Russell during her second hospital visit, testified that there were no signs of sexual trauma to the vaginal or anus areas nor evidence of forceful sexual contact. (Trial Tr., Vol. II at 119, 130-31).

Dr. Kenneth Pitts, Petitioner's treating psychiatrist, testified at trial that the assault upon Ms. Russell was brought on by a complex partial seizure ("CPS")[2], which left Petitioner incapable of appreciating the wrongfulness of his conduct, and that Petitioner

---

[2]Dr. Pitts testified that CPS involves the temporal lobe of the brain and produces: (1) neuropsychiatric symptoms, (2) visual and olfactory hallucinations, (3) psychotic phenomenon after the seizure, (4) rapid heart rate, (5) aggressive acting out, (6) no memory or awareness during the episode or seizure, and (7) no appreciation of any behavior or surroundings during the episode or seizure. (Trial Tr., Vol. III at 47-48, 106-07).

could not conform his conduct to the requirements of the law. *Id.* at 107-09. Dr. Lisa Marquis, the prosecution's expert witness, is a Ph.D. psychologist from the Center of Forensic Psychiatry, who evaluated Petitioner. She agreed that Petitioner suffered from a mental illness, and did not rule out that he suffered from a CPS disorder. (Trial Tr., Vol. III at 176-77, 201, 206-07). However, she disagreed that he did not appreciate the wrongfulness of his conduct and that he was not able to conform his behavior to the requirements of the law. *Id.* The prominent issues at trial were whether Petitioner was sane at the time he committed the assault, and whether Ms. Russell's version of events was a fabrication.

## II. PROCEDURAL HISTORY

After Petitioner's state court conviction, he filed an appeal of right and raised the following claims:

I. Craig Haskell maintained his innocence at sentencing in the statements he made to the court. In passing sentence the court repeatedly referred to Haskell's statements and tried to get him to admit guilt. The court violated Haskell's Fifth and Sixth Amendment rights by considering his refusal to admit guilt in its sentence. Further the trial court incorrectly scored the sentencing guidelines. For all of these reasons Haskell is entitled to a resentencing.

II. Prior trial counsel destroyed Haskell's ability to effectively defend himself at trial. Counsel lied to the police about Haskell's clothes, failed to prepare for trial, and failed to develop the insanity defense. But worst of all, counsel lied to the trial court about non-existent threats, which caused Haskell to be locked up, turned the court against Haskell, and created a situation where trial counsel could not effectively present the insanity defense. Therefore, he is entitled to a new trial.

III. The defense sought to introduce the statements Haskell made about the voices in his head when he burst into this parents bedroom after this incident. The statements about the voices fell within MRE 803(2) because they were excited utterances. When he "woke up" from his complex partial seizure, Haskell obviously observed a startling event - the injuries to Russell. When he arrived home shortly afterwards, he was obviously still under the stress of the event. Therefore, the court erred in excluding these statements.

IV.  The jury instruction on Mental Anguish (CJI 2d 20.9) as given was unfairly prejudicial to Haskell.  The instruction lists nine things for the jury to weigh when deciding whether the complainant suffered mental anguish. Seven of those factors were not supported by the evidence resulting in an instruction that was unfairly argumentative.  Haskell was denied a fair trial by this instruction because it was not tailored to the facts of the case.

V.  The trial court allowed the prosecutor's psychologist, Dr. Marquis, to sit in the courtroom and listen to Haskell's psychiatrist, Dr. Pitts, about Haskell's insanity.  Dr. Marquis had all of the information, including Dr. Pitts' notes from which she drew her own opinion about Haskell's mental state. Letting her listen to Dr. Pitts' testimony allowed her to shade her testimony, deprived Haskell of meaningful cross-examination, and violated Haskell's Sixth and Fourteenth Amendment rights.

Petitioner filed a supplemental brief on appeal raising the following ten additional

claims:

I.  The only evidence that rebutted the testimony of Haskell's psychiatrist regarding the nature, effects and symptoms of a complex partial epileptic seizure ("CPS seizure") was a non-physician who has no expertise in CPS and whose medical-fact testimony is unsupported by any medical literature and was patently false.  The presentation of that testimony violated Haskell's Fourteenth and Sixth Amendment rights.  It resulted in a verdict that contravenes *Morissette v. U.S.,* 342 U.S. 246 (1952), and that could not have been obtained otherwise, or at least could not have been sustained, under the Fourteenth Amendment's sufficiency-of-evidence due process standard.

II.  The prosecutor told the jury repeatedly at various stages of the trial, including during closing argument, that the pertinent area of expertise regarding the nature, effects and symptoms of a CPS seizure was not medicine but instead "forensics" and that Haskell's psychiatrist was an inappropriate expert because he was not an expert in forensics, and that the State's forensic psychologist rather than the jury itself was charged by law with determining the ultimate issue regarding the "insanity" defense.  She also said Haskell's psychiatrist, by testifying as an expert, was acting in violation of the "Code of Ethics" of the American Academy of Psychiatry and the Law, and therefore was violating medical ethics.  Those fundamental misstatements of law and of medical ethics violated Haskell's Fourteenth Amendment right to due process and his Sixth Amendment right to have the jury apply the law to the facts and draw the ultimate conclusion of guilt or innocence.  (See *U.S. v. Gaudin,* 515 U.S. 506 (1995)).

III.  During closing argument, the prosecutor told the jury that there really *is* no legal defense of insanity because a defense of insanity depends upon medical - expert opinion testimony, which, she said, can *never* be sufficient to establish legal insanity.  "But," she said, proving a "mental defense" is

nonetheless "what they have to do." The prosecutor's instruction of law to the jury regarding Haskell's burden of proof of legal insanity constituted structural error regarding burden of proof and also constituted prosecutorial misconduct, in violation of the Fourteenth and Sixth Amendments.

IV.  Compounding the prosecutor's misstatement regarding burden of proof of insanity, the jury was never told, either in the "insanity defense" jury instruction or elsewhere, that once Haskell proved his insanity defense by a preponderance of the evidence, the burden of proof shifted back to the prosecution to prove mental cognizance and control beyond a reasonable doubt.  That incomplete instruction to the jury thus misstated Haskell's and the State's respective burdens of proof, violations of the Fourteenth and Sixth Amendments.  Compounding this, in turn, in response to the jury's request for a further definition of the word "substantial" in the "insanity" instruction, the judge, ignoring the objection of Haskell's counsel, read the jury an inaproprate and probably misleading definition of the word from a 1950's dictionary he had in his chambers that could have been interpreted as placing upon Haskell an improperly high burden of proof of lack of cognizance in order to prove legal "insanity."

V.  The State's forensic psychologist stated her conclusory opinion on one of the two ultimate issues in this trial, testifying that in her opinion Haskell, at the time of the incident, possessed substantial awareness of control over his actions, and therefore the criminal element of "specific intent" - and thus invaded the province of the jury and violated Haskell's Sixth and Fourteenth Amendment rights, respectively, to jury determination of disputed facts and to due process of law.

VI.  Marquis' hearsay account of Russell's written statements  to the police about the events at issue – an iteration cleansed of inconsistencies and irrationalities, and presented to the jury after Russell had testified – violated Haskell's right under the Sixth Amendment's Confrontation Clause.  See *Crawford v. Washington,* 541 U.S. 36 (2004).

VII.  The videotaped reply for the jury, during its deliberations, of Marquis' entire testimony, unaccompanied by a replay of Dr. Pitts' countervailing testimony or any other testimony, and unaccompanied by a precautionary instruction, violated Haskell's Fourteenth Amendment right to due process especially in light of the improprieties of Marquis' testimony itself.

VIII.  The numerous constitutional errors discussed in this brief, individually and certainly taken together, constitute plain and harmful constitutional error that seriously affected the fairness, integrity or public reputation of trial.

IX.  The Sixth Amendment guarantees the right to the effective assistance of counsel, and the reason for the ineffective assistance of counsel need not be that counsel's fault; it can be, as in this case, prior counsel's fault, e.g., a palpably insufficient length of time to prepare the case for trial, and the

government's fault. Haskell's trial counsel's failure to preserve for appeal the constitutional errors delineated above, whatever the cause of that failure, denied Haskell his Sixth Amendment right to the effective assistance of counsel.

X. If, as Haskell's counsel believed and as appears accurate, Michigan law required Haskell to present his complex partial epileptic seizure defense as an "insanity" defense – an inappropriate medical defense for CPS seizure – this requirement of Michigan law itself violates the Fourteenth Amendment's due process clause.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Haskell,* No. 251929, 2005 WL 14899480, *1 (Mich. Ct. App. June 23, 2005) (unpublished).

Petitioner filed an application for leave to appeal with the Michigan Supreme Court raising the following issues:

I. Craig Haskell maintained his innocence at sentencing in the statements he made to the court. In passing sentence the court repeatedly referred to Haskell's statements and tried to get him to admit guilt. The court violated Haskell's Fifth and Sixth Amendment rights by considering his refusal to admit guilt in its sentence. Further the trial court incorrectly scored the sentencing guidelines. For all of these reasons Haskell is entitled to a resentencing.

II. Prior trial counsel destroyed Haskell's ability to effectively defend himself at trial. Counsel lied to the police about Haskell's clothes, failed to prepare for trial, and failed to develop the insanity defense. But worst of all, counsel lied to the trial court about non-existent threats, which caused Haskell to be locked up, turned the court against Haskell, and created a situation where trial counsel could not effectively present the insanity defense. Therefore, he is entitled to a new trial.

III. The defense sought to introduce the statements Haskell made about the voices in his head when he burst into his parent's bedroom after this incident. The statements about the  voices fell within MRE 803(2) because they were excited utterances. When he "woke up" from his complex partial seizure, Haskell obviously observed a startling event - the  injuries to Russell. When he arrived home shortly afterwards, he was obviously still under the stress of the event. Therefore, the court erred in excluding these statements.

IV. The jury instruction on Mental Anguish (CJI 2d 20.9) as given was unfairly prejudicial to Haskell. The instruction lists nine things for the jury to weigh when deciding whether the complainant suffered mental anguish. Seven of those factors were not supported by the evidence resulting in an instruction that was unfairly argumentative. Haskell was denied a fair trial by

this instruction because it was not tailored to the facts of the case.

V. The trial court allowed the prosecutor's psychologist, Dr. Marquis, to sit in the courtroom and listen to Haskell's psychiatrist, Dr. Pitts, about Haskell's insanity. Dr. Marquis had all of the information, including Dr. Pitts' notes from which she drew her own opinion about Haskell's mental state. Letting her listen to Dr. Pitts' testimony allowed her to shade her testimony, deprived Haskell of meaningful cross-examination, and violated Haskell's Sixth and Fourteenth Amendment rights.

VI. If, as Haskell's trial counsel believed and as appears accurate, Michigan law required Haskell to present his complex partial epileptic seizure defense as an "insanity" defense – an inappropriate medical defense for Complex Partial Epileptic Seizure – and thus artificially "prove" that Haskell was, at the relevant moments, insane as a medical fact, this requirement of Michigan law violates the Fourteenth Amendment's due process clause. Conversely, if trial counsel was incorrect, Haskell was denied his Sixth Amendment right to the effective assistance of counsel.

VII. The Court of Appeals appears to state that under Michigan law, expert witnesses' areas of expertise are fungible – that is, anyone qualified by the court as an expert in one area of expertise is permitted by law to testify as an expert in any other area of expertise irrespective of the witness's qualifications. If accurate as a statement of Michigan law, it violates the Fourteenth Amendment right to due process of law and the Sixth Amendment right to a jury determination of the acts as per, e.g., *Sullivan v. Louisiana.*

VIII. According to the Court of Appeals, Michigan law permits prosecutors to present experts in "forensics," i.e., experts in offering opinions in legal matters. Also according [to the] Court of Appeals, Michigan law permits prosecutors to tell the jury that experts in "forensics" are the appropriate type of expert to testify about a medical condition and that a medical expert is not an appropriate expert to testify about a medical condition if the physician isn't an expert in "forensics." If accurate, those rules of law violate the Fourteenth and Sixth Amendments.

IX. The jury was never told in the "insanity defense" jury instructions or elsewhere that once Haskell proved his insanity defense by a preponderance of the evidence, the burden of proof shifted back to the prosecution to prove mental cognizance and control beyond a reasonable doubt. The thus-incomplete instructions misstated Haskell's and the State's respective burdens of proof [and] violated the Fourteenth and Sixth Amendments.

X. Haskell was denied his Sixth Amendment right to the effective assistance of counsel, and there is a reasonable probability that, absent this, the outcome of his trial would have been different.

The Michigan Supreme Court denied Petitioner's application for leave to appeal stating that

"it was not persuaded that the questions presented should be reviewed by this Court."

*People v. Haskell,* 474 Mich. 1118; 712 N.W.2d 448 (2006) (table).

Petitioner now seeks a writ of habeas corpus asserting the following claims:

I.  Due process was denied by Mr. Haskell's conviction on the basis of testimony that was not accurate concerning his complex partial epileptic seizure disorder.

II.  Due process was violated because automatism, and therefore CPS seizure, is not appropriately an insanity defense at all, but is a separate claim that may eliminate the voluntariness of a criminal act.

III.  Haskell's Sixth Amendment rights were violated because the instruction the jury was given regarding burden of poof in insanity–defense cases was incomplete in that it improperly failed to instruct the jury that once Haskell met his burden of proof by a preponderance of the evidence that his mental state met the statutory definition of "insanity," [and] the burden of proof shifted back to the State to prove *mens rea,* an element of the crimes charged beyond a reasonable doubt.

IV.  Ineffective assistance of counsel by Ronald J. Plunkett.

V.  Ineffective assistance of counsel of Haskell's trial counsel Barry Resnick.

VI.  Haskell's Fifth and Sixth Amendment rights were violated by using events in a single event to find him a[n] habitual offender and to not have had the jury make the requisite fact finding to warrant this conclusion.

Respondent filed an answer to the petition, asserting that: Petitioner's evidentiary and instructional issues are not cognizable claims subject to habeas relief; the state court's decision regarding Petitioner's ineffective assistance claim was not contrary to *Strickland v. Washington,* 466 U.S. 668 (1984); Petitioner's sentencing claim is without merit; and the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") does not violate the Suspension Clause of the United States Constitution.  In response, Petitioner filed a reply brief addressing the issue of exhaustion and an analysis under 28 U.S.C. §2254(d)(1) and (2).

Petitioner subsequently filed a motion for oral argument asserting that the habeas

petition "raises several issues of unusual complexity that oral argument would aid the court in navigating." (Mot. at 2). The Court granted the motion finding that oral argument relative to the nature of a CPS disorder and Petitioner's ineffective assistance of counsel claims would assist in resolving these matters. (Dkt. # 15). A hearing was held and, following the proceeding, the Court asked the parties to submit supplemental briefs in further support of their respective arguments. Respondent filed a "Post-Hearing Summary" and Petitioner filed a responsive pleading.

### III. STANDARD

The AEDPA governs this Court's habeas corpus review of state court decisions. Petitioner is entitled to the writ of habeas corpus if he can show that the state court's adjudication of his claim on the merits:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceedings.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

"[A]n *unreasonable* application of federal law is different from an *incorrect* application

of federal law." *Id.* at 410 (emphasis in original). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law is objectively unreasonable." *Id.* at 409. "Furthermore, state findings of fact are presumed to be correct unless the defendant can rebut the presumption by clear and convincing evidence." *Baze v. Parker,* 371 F.2d 310, 318 (6th Cir. 2004) (citing 28 U.S.C. §2254(e)(1)).

## IV. DISCUSSION[3]

### A.  Due Process Violation - Inaccurate Testimony<br>Concerning Complex Partial Epileptic Seizure Disorder

Petitioner contends that he was denied due process because his conviction was based upon inaccurate testimony as provided by the prosecution's expert witness, Dr. Lisa Marie Marquis, about his complex partial epileptic seizure disorder.

The Michigan Court of Appeals rejected Petitioner's claim as  follows:

> We disagree that the testimony was false or that the trial court erred in admitting it.  Defendant essentially argues that the prosecutor's expert testimony concerning the effect of a complex  partial seizure was incorrect as a matter of medical fact. However, defendant misconstrues the prosecutor's expert's testimony.  The expert did not testify that someone experiencing a complex partial seizure would still be in control and cognizant. In fact, during cross-examination, she admitted that someone experiencing a seizure may not appreciate the wrongfulness of their behavior, may not be able to conform their actions to the law, and may not remember what happened during a seizure.  Instead, the prosecutor's expert testified that, after reviewing the information concerning defendant's actions before, after and *during* the assault, she found nothing to suggest that defendant was not cognizant of what was happening or was unable to control his actions. This testimony supports a finding that even if defendant suffers from the disorder, she found nothing to suggest that defendant was suffering from an actual seizure at the time of the assault.  The trial court did not err.

Defendant next asserts that the trial court plainly erred in admitting the

_____

[3]  Because Respondent claims that Petitioner has either failed to exhaust certain claims or that some of his claims are procedurally defaulted, and because Petitioner has filed an extensive Reply brief addressing the issues, the Court will address the issues of exhaustion and procedural default relative to each claim.

prosecutor's expert's testimony stating her opinion concerning defendant's mental cognizance and capacity for control at the time of the assault. We disagree. MRE 704 provides, "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact. "Michigan case law specifically states that an expert testifying in a criminal case can give an opinion as to whether a defendant is able to conform his conduct to the requirements of the law and whether he is mentally ill or insane. Therefore, defendant has failed to show plain error through the admission of such opinion testimony

*Haskell,* 2005 WL 14899480, *1, *2   (internal citations omitted).

### 1. Procedural Default

Petitioner does not dispute that this issue is procedurally defaulted as there were no challenges at trial to Dr. Marquis' qualifications as an expert, nor any objections or motions to strike her testimony.   In this case, the last state court to issue a reasoned opinion addressing Petitioner's claim that Dr. Marquis provided inaccurate information about the CPS disorder held that the claim was not preserved for review because no such challenge was put before the trial court. *Id.* at *1.  Where "a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  Petitioner's claim regarding Dr. Marquis' expert testimony is procedurally defaulted.

While the procedural default doctrine precludes habeas relief on a defaulted claim, the procedural default doctrine is not jurisdictional. *Trest v. Cain*, 522 U.S. 87, 89 (1997); *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005).  The Court proceeds to address the merits of Petitioner's claim.

### 2.  Analysis

Alleged trial court errors in the application of state evidentiary law are generally not cognizable as grounds for federal habeas relief.

> [A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no affect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution.

*Pemberton v. Collins,* 991 F.2d 1218, 1223 (5th Cir. 1993). "[E]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow,* 25 F.3d 363, 370 (6th Cir. 1994).

In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett,* 169 F.3d at 1163; see also *Coleman v. Mitchell,* 244F.3d 533, 542 (6th Cir. 2001). Where a specific constitutional right is not implicated, federal habeas relief is available only if the alleged erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle,* 463 U.S. 880, 899 (1983).

### a. Backgrounds of Prosecution Expert Dr. Lisa Marie Marquis and Petitioner's Psychiatrist and Expert Dr. Kenneth Pitts

Petitioner contends that Dr. Marquis' testimony should not have been admitted into evidence because of her inexperience and lack of expertise in the area of CPS disorders, and because of several false assertions she made to the jury about a CPS disorder and its effect upon Petitioner. Based on these circumstances and the fact that the jury requested a complete transcript of only Dr. Marquis' trial testimony, and was instead shown an audio/video tape, Petitioner maintains that Dr. Marquis' erroneous testimony heavily

influenced the jury's decision in finding him guilty but mentally ill, and resulted in an unfair trial.

Dr. Marquis, a certified consulting forensic psychologist, admittedly has no medical training, and has only been exposed to principles of psychiatry or other psychiatric matters through seminars and internships. (Trial Tr., Vol. III at 191). Dr. Marquis conducts forensic examinations and practices from the Center for Forensic Psychiatry. *Id.* 161. She is not a neuropsychologist or a neurologist. *Id.* at 210. Dr. Marquis' only training in the area of CPS disorders was in the form of a one-hour lecture/seminar. *Id.* at 166-67,197. She has conducted no studies regarding CPS disorders, nor has she performed any case histories of persons suffering from the disorder. *Id.* at 197-98. Dr. Marquis has looked at other CPS disorder case studies, but has spent less than 1% of her time reviewing such studies. *Id.* at 199. She did not evaluate Petitioner for a seizure disorder because she is a forensic psychologist. *Id.* at 188-89. Dr. Marquis based her opinions upon Petitioner's "behaviors" rather than a "diagnosis." *Id.* She also testified that Petitioner could have suffered from CPS when he assaulted Ms. Russell. *Id.* at 196, 201.

Petitioner's expert witness Dr. Pitts is a practicing psychiatrist who first met and evaluated Petitioner on June 15, 2002, approximately one month after Ms. Russell was assaulted by Petitioner. Petitioner had not been previously evaluated for a CPS disorder. Dr. Pitts is certified by the American Board of Neurology and Psychiatry. (Trial Tr., Vol. III at 8). Unlike Dr. Marquis, Dr. Pitts has no training in the area of forensic psychiatry, nor has he attended any conferences, studied, or written about forensic psychiatry topics. *Id.* at 10-11.

### b. Testimony of Dr. Marquis and Dr. Pitts

Petitioner cites the following as factual errors in Dr. Marquis' testimony: (1) a person experiencing CPS *might* still be in control and cognizant; (2) a CPS diagnosis is irrelevant to a "determination of the extent to which a person was mentally cognizant and in control during the seizure"; (3) "mental cognizance and control in the hours and minutes preceding and succeeding a seizure indicate mental cognizance and control *during* the seizure"; (4) "amnesia about what transpired during the seizure is *not* likely and [] the fact that Haskell had not experienced memory loss at 'at any other time' indicates that he did not experience memory loss about what transpired *during* the seizure - and [] therefore his claim of amnesia 'strains credulity'"; (5) "the *appearance* of purposefulness during the seizure indicates cognizance during the seizure;" (6) "Haskell's cognizance *several months later* when she, Dr. Marquis, interviewed him suggests that he was cognizant at the time of the incident at issue"; (7) "violence during a CPS seizure is extremely rare"; and (8) "emotional stress is not associated with the onset of a CPS seizure." (Pet'r. Mich. Sup. Ct. Brief, at 38-40); (Trial Tr. Vol. III, at 177, 180-81, 183-86, 188, 195-96, 200-01, 209).

It is Petitioner's position that this inaccurate testimony misled the jury into believing that Petitioner was aware of the fact that he was assaulting Ms. Russell, he had control of his actions, and that he was able to appreciate the wrongfulness of his conduct. Petitioner argues these opinions conveyed by Dr. Marquis precluded the jury from finding Petitioner not guilty of the assault, and deprived him of a fair trial.

Respondent argues that, although Petitioner's expert Dr. Pitts testified that Petitioner's EEG results indicated some abnormality and evidence of a brain lesion consistent with a CPS diagnosis, Dr. Pitts did not testify that his diagnosis of Petitioner was in fact a CPS disorder. Specifically, Respondent argues Dr. Pitts instead testified that his evaluation of Petitioner revealed Petitioner suffered from a "psychotic illness" which was

receptive to treatment with anti-psychotic medication. *Id.* at 91. Dr. Pitts did not testify that every individual with an abnormal EEG and a brain lesion is necessarily suffering from a CPS disorder.

Dr. Marquis' opinions regarding Petitioner's conduct conveyed to the jury that Petitioner was cognizant of his actions *during* the assault, undermining Petitioner's insanity defense. If the admitted evidence is unreliable and if it's unreliability cannot reasonably be uncovered or recognized as being evidence that can be depended upon, grounds are presented for habeas relief. *Barefoot*, 463 U.S. at 899. CPS disorder is certainly not a condition that is generally known about and understood. It would be reasonable for the jury to rely heavily upon expert witness testimony regarding Petitioner's condition and CPS disorders.

The Court has reviewed the CPS disorder documentation and the testimony of Dr. Marquis and Dr. Pitts, and finds that Petitioner's conviction and the state appellate courts' affirmations of the conviction were based on a reasonable determination of the facts in light of the evidence presented at trial.

> During a complex partial seizure, consciousness is impaired. The person cannot interact normally with other people; is not in control of his or her movements, speech, or actions; doesn't know what he or she is doing; and cannot remember afterward what happened during the seizure.
>
> Although someone may appear to be conscious because he stays on his feet, his eyes are open and he can move about, it will be an altered consciousness - a *dreamlike*, almost *trancelike* state.

(App. Brief, App. A-1); (Trial Tr. Vol. III, at 209) (emphasis added). Dr. Marquis testified that, although a CPS diagnosis cannot be ruled out as the illness from which Petitioner suffered, "the very extreme aggressive behavior allegedly seen in this criminal activity would be very rare for someone with this kind of seizure disorder." *Id.* at 202, 209.

17

"[T]he hallmark of complex partial seizures is the fact that the patient initially has impaired consciousness with decreased awareness of self and the environment, *and also amnesia for the event afterwards.*" (App. Brief, App. F-4) (emphasis added). Dr. Marquis acknowledged that amnesia of an event after it occurrs is an indication of a CPS disorder, clarifying that does not mean that Petitioner did not "realize" and/or "remember" what was transpiring *during* the assault. *Id.* at 196-97. According to Dr. Marquis, Petitioner's asserted failure to remember sexually assaulting Ms. Russell did not necessarily equate with a CPS diagnosis, a legitimate assessment.

Record evidence indicates that, during a seizure, a person suffering from complex partial seizure disorder can be "vicious," act out sexually, and become very emotional. (Dkt. #16: Ex. G-2, H-2, H-4). Dr. Marquis testified that it would be "rare" for a person with CPS disorder to behave in the manner in which Petitioner has been accused, which included "crying," saying "mean things," and the assault. (Trial Tr. Vol. III, at 188, 209). Dr. Marquis' testimony is not inconsistent with the record evidence.

Supporting documentation regarding CPS disorders indicates: (1) a CPS episode lasts from 90 to 120 seconds; (2) an individual experiencing a CPS type seizure is unfocused, confused, disorganized, and unable to control his or her movements; (3) CPS episodes are debilitating; and (4) CPS type seizures result in reflex-like actions. (Dkt. #16: Ex. A-1, F-7). Ms. Russell's sexual assault lasted approximately 20 minutes. According to Ms. Russell's account, Petitioner's behavior was purposeful, and entirely inconsistent with a CPS episode.

Although there were some test results indicating Petitioner suffered a CPS seizure, including Dr. Pitts' testimony, Trial Tr., Vol. III, 90-93, 141-146, there was other evidence contradicting a finding of a CPS episode: (1) Petitioner was responsive to Ms. Russell

during the sexual assault, undermining any reasonable inference that he was in a trance-like state and did not know what was going on; (2) Petitioner disrobed Ms. Russell's clothing, issued threats against her and her family, and sought to quiet her screams by attempting to put his hand down her throat; and (3) Petitioner admitted planning a sexual assault. (Trial Tr., Vol. III, at 180, 185-86, 196, 198); (Dkt. #16: Ex. A-1; B-6, 16-17; F-4; G-1).

The jury ultimately chose to conclude from the totality of the evidence that, although Petitioner was mentally ill, he was not insane and was guilty of sexually assaulting Ms. Russell. The fact that the jury chose to believe the facts as testified by Ms. Russell and as supported by Dr. Marquis' testimony, as well as other evidence presented by the prosecution, does not warrant habeas relief. *Kelly*, 25 F.3d at 370. Petitioner's argument that Dr. Pitt's testimony was the more credible testimony is without merit. Petitioner has not advanced persuasive evidence that the jury was unfairly swayed by watching an audio/video tape of Dr. Marquis' testimony.

### B. Due Process Violation - Complex Partial Epileptic Seizure Disorder is not a Proper Basis for an Insanity Defense

Petitioner contends that criminal conduct caused by a CPS disorder cannot be categorized as "insane" behavior because the very nature of such a seizure places the individual in a state of unconsciousness or semi–consciousness. (Pet. Memo., at 18). Petitioner claims that the proper defense would have been automatism accompanied by the following argument:

> Section 44 of Wayne R. LaFave & Austin W. Scott, Jr. Criminal Law (1972 states: "A defense related to but different from the defense of insanity is that of unconsciousness, often referred to as automatism: one who engages in what would otherwise be criminal conduct is not guilty of a crime if he does so in a state of unconsciousness or semi-consciousness." Automatism eliminates one of the basic elements of the crime – either mental state or the

voluntary nature of the act. As such, once the issue of automatism is raised by the defense, the State must disprove it beyond a reasonable doubt in order to meet its burden of proof with respect to the elements of the crime. In other words, the burden of proof on this issue, once raised by the defense, remains on the State to prove that the act was voluntary beyond a reasonable doubt.   An instruction on the defense of automatism is *required* when there is reasonable evidence that the defendant was unconscious at the time of the commission of the crime, and Haskell had a Fourteenth Amendment right to have the jury so instructed.

* * *

The insanity instruction and the insanity defense itself instructed the jury that a defense of CPS seizure is a psychiatric rather than a neurologic illness – a "diminished capacity" defense rather than an absolute defense – thus allowing the jury to do what it did in Haskell's case: find him "Guilty but mentally ill.  But just as a woman cannot be a little bit pregnant, a person cannot be "Guilty but mentally ill" while experiencing a CPS seizure.  That's because intent, and therefore cognizance — therefore *consciousness*– is an element of all felonies. See *Morissette v. U.S., supra*

By contrast, the burden of proof in an automation-defense case would remain on the State to prove that the act was voluntary beyond a reasonable doubt.

*Id.* at 18-20 (emphasis in original).  Petitioner argues that if Michigan law does not allow for an automatism defense, "i.e., a defense of complete absence of *mens rea* due to complete absence of consciousness and control," then Michigan law violates the  Fourteenth Amendment.  *Id.* at 21.  Alternatively, Petitioner argues that if such a defense is available in Michigan, then his trial counsel Barry Resnick was ineffective in failing to  advance the proper automatism argument. *Id.*

This issue has been exhausted.  Petitioner raised the issue in his supplemental brief on direct appeal as issue " X", and raised it in his application for leave to appeal to the Michigan Supreme Court as issue "VI".  The Michigan Court of Appeals did not address this issue.  Consequently, the state appellate courts did not adjudicate this claim on its merits or otherwise.  The Court will review the issue *de novo. Howard,* 405 F.3d at 467.

Automatism has not been shown to be a recognized defense in Michigan.  *See People v. Griffin,* 108 Mich. App. 625, 641; 310 N.W.2d 829 (1981) (not reaching the issue

20

of whether "the defense of automatism should be recognized in Michigan[.]"). This Court has not found Michigan precedent or statutory authority recognizing automatism as a criminal defense. Mr. Resnick cannot be found deficient in his representation of Petitioner for failing to raise a defense not recognized in Michigan.

There is a reasonable argument that Michigan should adopt the defense of automatism as part of its criminal law jurisprudence. Other states have adopted the defense.

> In Oklahoma, the defense of automatism or unconsciousness under Okla. Stat. Ann. Tit. 21 §152(6) (1998), involves criminal conduct resulting from an involuntary act completely beyond the individual's knowledge and control, and cannot be used where the defendant's unconsciousness results from the voluntary consumption of alcohol or drugs. It is a defense distinct from that of insanity, and [e]xamples of automatic conduct are blackouts and epileptic seizures.

*West v. Addisson,* 127 Fed. Appx. 419, 422, n.5 (10th Cir. 2005) (internal citations and quotations omitted). "Automatism has been recognized by courts as a valid defense bearing on the voluntariness of an otherwise criminal act." *Haynes v. United States,* 451 F.Supp.2d 713, 724 (D. Md. 2006), citing John Parry & Eric Y. Drogin, *Criminal Law Handbook on Psychiatric Psychological Evidence and Testimony,* 155-56, 174-75 (Am. Bar Ass'n, ed. 2000). "On the other hand, 'automatism' also has a meaning in common parlance where it refers to the 'performance of acts by an individual without his awareness or conscious volition.'" *Haynes,* 451 F.Supp.2d at 724, citing *Webster's Encyclopedic Unabridged Dictionary of the English Language* 101 (1994). "With or without expert testimony, arguing that condition is something that counsel . . . is frequently able to do." *Id.* "As a result, it can be argued that he has acted without the necessary criminal intent, even if not acting while insane or in a certifiable medical sense." *Id.*

Nevertheless, it is well established that the circumstances under which a criminal

defense may be asserted is a question of state law. *United States v. Scheffer,* 523 U.S. 303, 308 (1998); see also, *Lakin v. Stine,* 80 Fed Appx. 368, 373 (6th Cir. 2003). State courts are the "ultimate expositors of state law." *Mullaney v. Wilbur,* 421 U.S. 684, 691 (1975). Petitioner argues that Michigan's refusal to adopt automatism as a criminal defense violates his right to due process under the Fourteenth Amendment.

The right of an accused to present a defense has long been recognized as "a fundamental element of due process." *Washington v. State,* 388 U.S. 14, 19 (1967). However, "due process does not require that a defendant be permitted to present any defense he chooses." *Lakin,* 80 Fed Appx. at 373. "Rather, states are allowed to define the elements of, and defenses to, state crimes." *Id.*

In this case, Petitioner was not denied due process by Michigan's failure to expressly recognize automatism as a defense in common law or by statute. Even absent formal recognition of the defense, Petitioner was afforded a meaningful opportunity at trial to present his CPS seizure defense through lay and expert witnesses. See *Crane v. Kentucky,* 476 U.S. 683, 690 (1986). The trial court did not preclude Petitioner from presenting his defense that, as a result of his CPS disorder, he performed the alleged criminal acts, including sexual assault, "without his awareness or conscious volition.'" *Haynes,* 451 F.Supp.2d at 724. Although the jury was not given a formal automatism instruction, the trial court was under no constitutional mandate to do so and committed no error. *Mullaney,* 421 U.S. at 691. Habeas relief is not warranted relative to Petitioner's claim that he was denied due process of law.

### C. Improper Insanity Defense Jury Instruction

Petitioner argues that the trial court erred by failing to instruct the jury that, once Petitioner met his burden of proof by a preponderance of the evidence that his mental state

met the statutory definition of "insanity," the burden shifted back to the state to prove the

*mens rea* element of the charged crimes beyond a reasonable doubt. The Michigan Court

of Appeals considered the issue.

> Defendant did not object to the insanity defense instruction challenged on appeal and, when given the opportunity to note any corrections needed to the instructions given, indicated his acceptance of the instructions; therefore, defendant has waived this issue on appeal . Because defendant waived this right there is no error to review. Regardless, pursuant to MCL 768.20a(3) [and MCL 768.36(1)], defendant has the burden of proving his defense of legal insanity by a preponderance of the evidence. Therefore, contrary to defendant's assertion on appeal, the instruction correctly advised the jury of the burdens of proof regarding defendant's legal insanity defense.

*Haskell*, 2005 WL 14899480, *3 (internal citations omitted). Petitioner concedes that his

claim of an erroneous jury instruction on the insanity issue was not preserved for appellate

review. Petitioner's jury instruction claim is thus procedurally defaulted. The Court

nonetheless proceeds to address the merits of the claim.

In order for habeas relief to be warranted on the basis of incorrect jury instructions,

a petitioner must show more than the instructions were undesirable, erroneous, or

universally condemned; rather, the jury instructions viewed as a whole must be shown to

be so infirm that they rendered the entire trial fundamentally unfair. *Estelle,* 502 U.S. at 72.

"The only question for us is 'whether the ailing instruction by itself so infected the entire trial

that the resulting conviction violates due process.'" *Id.,* citing *Cupp v. Naughton,* 414 U.S.

141 (1973). The issue is not whether the jury instruction could have been applied

unconstitutionally, but whether there is a reasonable likelihood that the jury applied the

instruction in an unconstitutional manner. See *Victor v. Nebraska,* 511 U.S. 1, 6 (1994).

Due process neither prohibits trial courts from defining reasonable doubt, nor does it

require them to do so as a matter of course, so long as the trial court instructs the jury on

the necessity that the defendant's guilt must be proven beyond a reasonable doubt. *Id.* at

5.

If an instruction is ambiguous and not necessarily erroneous, it violates the Constitution only if there is a reasonable likelihood that the jury has applied the instruction improperly. *Binder v. Stegall,* 198 F.3d 177, 179 (6th Cir. 1999). A jury instruction is not to be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial court record. See *Grant v. Rivers,* 920 F.Supp. 769, 784 (E.D. Mich. 1996). "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe,* 431 U.S. 145, 155 (1977). State law instructional errors rarely form the basis for federal habeas corpus relief. *Estelle,* 502 U.S. at 71-72.

The state trial court accurately instructed the jury about the requisite burden of proof in an insanity defense under Michigan law.

> And as to insanity, you'll get that instruction in a little bit, and that is the Defendant must prove insanity by a preponderance of the evidence. If you find that the Prosecution has not proven every element beyond a reasonable doubt, then you must find the Defendant not guilty.
>
> *  *  *
>
> The defense of legal insanity has been raised in this case and that is an affirmative defense that the Defendant has the burden of proving by a preponderance of the evidence. This means that the Defendant must satisfy you by evidence that outweighs the evidence against it that he was legally insane when he committed the acts constituting the offense . . .
>
> Before you may consider the legal insanity defense, of course, you must be convinced beyond a reasonable doubt that the Defendant committed each of the alleged acts. If you are, you should consider the Defendant's claim that he was legally insane at the time.
>
> *  *  *
>
> There is another verdict that is completely different from the verdict of not guilty because of insanity and this is called guilty, but mentally ill. If you find the Defendant guilty but mentally ill, you must find each of the following. First, that the Prosecution has proven beyond a reasonable doubt that the

Defendant is guilty of a crime. Second, that Defendant has proven by a preponderance of the evidence that he was mentally ill as I have defined that term for you at the time of the crime. And third, that the Defendant has not proven by a preponderance of the evidence that he lacks the substantial capacity either to appreciate the nature and quality of the wrongfulness of his conduct or to confirm, conform his conduct to the requirements of the law. Legal insanity [may] be permanent or temporary. You must decide whether the Defendant was legally insane at the time of the alleged crime.

(Trial Tr., Vol. III. at 262-63, 275-76, 278-79). The state trial court also gave Michigan's standard reasonable doubt instruction.

A reasonable doubt is a fair, honest doubt growing out of the evidence or lack of evidence. It's not merely an imaginary or possible doubt, but it's a doubt based on reason and common sense. A reasonable doubt is just that, a doubt that is reasonable after a careful and considered examination of the facts and circumstances of this case.

*Id.* at 263.

Considering the jury instructions as a whole, the trial court properly instructed the jury on the burden of proof and the concept of reasonable doubt. There is no reasonable likelihood that the jury applied those instructions in an unconstitutional manner. *Binder*, 198 F.3d at 179. The Michigan Court of Appeals' resolution of this issue was not "contrary to" clearly established federal law. See 28 U.S.C. §2254(d). Habeas relief on Petitioner's jury instruction claim will be denied.

### D. Ineffective Assistance of Counsel

Petitioner contends that he received ineffective assistance of counsel from Ronald J. Plunkett, who represented Petitioner from June 2002 until May 2003.[4] The crux of Petitioner's claim is that Mr. Plunkett was not prepared. Petitioner also claims that the attorney who represented his interests after Mr. Plunkett's withdrawal, Barry Resnick, was

---

[4]Mr. Plunkett represented Petitioner at his arraignment, preliminary examination and through the pre-trial process.

also unprepared because he was completely unknowledgeable about CPS disorders, the basis of Petitioner's defense.[5]

### 1. Attorney Ronald J. Plunkett

The Michigan Court of Appeals did not agree with Petitioner's ineffective assistance of counsel argument relative to Ronald J. Plunkett. The court held as follows:

> Defendant first argues that . . . Ronald Plunkett, either misrepresented or lied to the trial court in chambers about a perceived threat regarding defendant and/or his family and that these misrepresentations resulted in defendant's bond being cancelled, precluded the performance of a diagnostic test to confirm defendant's expert's diagnosis, and precluded interviews of defendant by independent forensic psychiatrists or psychologists. We disagree. The trial court heard testimony regarding these statements on July 9, 2003, and found Plunkett's testimony credible that certain statements were made the night before he withdrew as defendant's counsel on May 19, 2003, which at the time, led him to believe that there was a threat of violence. This court must give regard to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it.
>
> *   *   *
>
> [D]efendant has failed to show that completion of the desired tests and examinations were impossible because defendant was remanded to jail.
>
> *   *   *
>
> [D]efendant has not demonstrated a reasonable probability that the result of the proceedings would have been different had defendant's bond not been revoked.
>
> Defendant also argues that he received ineffective assistance of counsel from Plunkett because it was clear that, on the eve of trial, Plunkett was not prepared to represent defendant at trial and had not prepared an insanity defense . . . . Defendant's argument lacks merit because Plunkett did not represent him at trial and defendant's trial attorney was allowed additional time in which to prepare after taking over the case. Defendant does not assert that his actual trial counsel was unprepared. Therefore, even assuming that Plunkett was unprepared, defendant has not shown that he was prejudiced where his actual counsel requested and received additional time in which to prepare for trial.
>
> Defendant also asserts that he received ineffective assistance of counsel

---

[5]Mr. Resnick represented Petitioner's interests during trial and at sentencing.

from Plunkett because Plunkett failed to file the required notice, under MCL 750.520j(2), that defendant intended to question the victim about their prior sexual conduct and misinformed the police about defendant's clothes being washed so that testing was never completed on the clothes. We disagree.

\* \* \*

In this case, the trial court granted the prosecutor's motion to exclude this evidence based on the lack of the proper notice; however, the trial court changed its decision after the prosecutor referred to defendant wanting to have sex with the victim "one more time" in her opening statement and allowed defendant to cross-examine her about this previous sexual conduct. Defense counsel was then able to question the victim as to why she continued to talk to defendant after these relations and, amidst her refusal to rekindle their relationship, she admitted that defendant had never forced her to do anything before. Furthermore, defendant's expert testified as to portions of the victim's preliminary examination testimony, that he used in his diagnosis of defendant, and read a portion, which included questions to the victim about whether defendant had ever scared or threatened her in the past before having sexual relations with her. Therefore, the jury knew from previous testimony that the victim and defendant had dated for over two years and, because of defendant's cross-examination, knew that the two had been sexually intimate. While defendant argues that he was not allowed to elicit testimony from the victim regarding her desire to keep her sexual activity from her parents, this ignores the trial court's specific direction to defendant's trial counsel to request a hearing if he wished to pursue testimony outside the scope of its limitation. No such request was made. Defendant has failed to show that he was prejudiced by Plunkett's failure to file the required notice.

\* \* \*

Defendant finally argues that he received ineffective assistance of counsel from Plunkett because Plunkett misrepresented the time defendant might serve if he accepted the plea offer and communicated the offer to him only the night before trial. We disagree. Defendant argues that Plunkett told defendant that he would serve only two or three years in prison and that such advice is dangerously incompetent as defendant would realistically serve much longer if he pleaded guilty to two counts of third-degree CSC. However, defendant refused this offer and continued to trial under new representation, therefore, defendant has failed to show how this advice prejudiced him.

*Haskell,* 2005 WL 14899480, *6, *7 (internal citations omitted). This issue has been

exhausted as it was briefed on direct appeal in Petitioner's supplemental brief at issue "IX"

(and at pages 18-20) and was raised in Petitioner's application for leave to appeal to the

Michigan Supreme Court at issue "X."

In *Strickland, supra*, the United States Supreme Court set forth the two-pronged test for determining whether a habeas petitioner has received ineffective assistance of counsel. First, a petitioner must prove that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed by the Sixth Amendment. *Strickland,* 466 U.S. at 687. Second, the petitioner must establish that the deficient performance prejudiced his defense. Counsel's errors must have been so serious that they deprived the petitioner of a fair trial or appeal. *Id.*

With respect to the performance prong, a petitioner must identify the acts which were "outside the wide range of professionally competent assistance[.]" *Id.* at 690. The reviewing court's scrutiny of counsel's performance is highly deferential. *Id.* at 689. The court must recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690. To satisfy the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Id.* "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *McQueen v. Scroggy,* 99 F.3d 1302, 1311-12 (6th Cir. 1996).

Consistent with the Michigan Court of Appeals' decision, this Court likewise finds that Mr. Plunkett's alleged lack of preparedness was generally inconsequential in that Mr.

Resnick tried the case to the jury. Petitioner identifies various specific acts that contributed to Mr. Plunkett's alleged deficient representation: (1) Mr. Plunkett and his wife's divorce became final four days after Mr. Plunkett was retained; (2) Mr. Plunkett has admitted to a crack cocaine addiction; (3) Mr. Plunkett was arrested for possession of 25 grams of crack cocaine and is facing incarceration; (4) the Michigan Attorney Grievance Commission was appointed receiver of Mr. Plunkett's files after the Commission received notice that Mr. Plunkett abandoned his law practice; (5) Mr. Plunkett was under investigation for the death of a 22-year-old woman who was found dead in his apartment from an apparent drug overdose; (6) Mr. Plunkett withdrew as Petitioner's attorney the day before trial was scheduled; (7) Mr. Plunkett requested so many trial date continuances in the past that the trial judge was initially going to allow Petitioner's new attorney Mr. Resnick only three weeks to prepare for trial; (8) Mr. Plunkett told the trial judge that Petitioner threatened him with physical violence, which led to the revocation of Petitioner's bond; (9) Dr. Pitts attested at trial and in an affidavit that Petitioner's incarceration while awaiting trial made it difficult and/or impossible to conduct proper testing in preparation for Petitioner's defense; and (10) Mr. Plunkett's story about being threatened by Petitioner was inconsistent. As to the latter incident, Petitioner argues Mr. Plunkett first told the trial judge that Petitioner threatened him, but at a July 9, 2003 bond hearing, Mr. Plunkett stated that he may have "misinterpreted" what Petitioner had said to him. Petitioner asserts that Mr. Plunkett responded to an attorney grievance by saying that it was Petitioner's father, William Haskell, who had threatened him.[6]

The Court finds it is speculative at best for Petitioner to argue that that the above

---

[6]Most of these issues were revealed *after* Mr. Plunkett was no longer Petitioner's counsel.

stated series of events adversely affected the trial judge's view of Petitioner in a constitutional sense, the judge's patience with the parties and the attorneys, the latitude extended to Mr. Resnick to prepare for trial, or Mr. Resnick's ability to prepare Petitioner's insanity defense under an abbreviated time restriction. The Court notes there was a four year span of time between Mr. Plunkett's narcotics arrest and Petitioner's conviction. Mr. Plunkett's controversial and negative personal issues do not equate with ineffective assistance of counsel. Petitioner has failed to demonstrate how Mr. Plunkett's personal and legal problems adversely impacted or prejudiced his right to a fair trial. *Strickland*, 466 U.S. at 687. Mr. Plunkett did not represent Petitioner at trial. The state trial court granted Petitioner's new attorney Mr. Resnick a two month extension to review the file and prepare for trial. Notwithstanding Mr. Plunkett's failure to give 10-day notice under M.C.L. § 750.520(j) that Petitioner intended to use evidence of Russell's prior sexual relations with him at trial, the state trial court ultimately permitted Russell to be cross-examined about their prior sexual conduct at trial. Petitioner has not met the *Strickland* standard for demonstrating ineffective assistance of counsel with respect to Mr. Plunkett. *Id.*

### 2. Attorney Barry Resnick

Petitioner argues that Mr. Resnick's ineffectiveness as trial counsel resulted from his lack of knowledge about CPS disorders. Petitioner asserts that Mr. Resnick failed to: (1) object to Dr. Marquis as an expert witness and the admission of her testimony; (2) object to the insanity defense jury instruction; (3) raise the automatism defense; and (4) explain to the jury that the totality of Petitioner's actions consisted only of hitting Ms. Russell in the face and stomach during a 15-30 second time period, and did not include a sexual assault. (Pet. at 13).

The Michigan Court of Appeals rejected Petitioner's ineffective assistance of counsel

claim against Mr. Resnick.

> Defendant's claim that he was deprived of effective assistance of counsel because his trial counsel failed to object to the assertions of error addressed on appeal lacks merit because counsel is not required to advocate a meritless position.   . . . [D]efendant has failed to show any prosecutorial misconduct, instructional error, or improper admission of evidence. Therefore, his trial counsel was not ineffective for failing to object to these assertions of error.

*Haskell,* 2005 WL 14899480, *7 (internal citations omitted).  Petitioner exhausted this issue by raising it in his supplemental appellate brief on direct appeal under issues "IX" and "X," and by raising the issue in his application for leave to appeal to the Michigan Supreme Court under issue "X."

The Court has concluded herein that Dr. Marquis' testimony was factually consistent with the nature of a CPS disorder.  Mr. Resnick's failure to object to the admission of her testimony, and his failure to challenge Dr. Marquis' use as an expert, does not support a finding that Mr. Resnick's performance resulted in the denial of Petitioner's right to a fair trial.  *Strickland*, 466 U.S. at 687.

Petitioner makes an unsupported statement in his petition that "Mr. Resnick had never heard of complex partial epileptic seizure before, and substituted in for Plunkett barely more than two months before the trial date." (Pet. Memo at 25).  The Court has reviewed the affidavits of Mr. Resnick and Dr. Pitts, Petitioner's psychiatrist and expert witness, and it is clear that   Mr. Resnick contacted Dr. Pitts several times regarding Petitioner's condition and information about CPS disorders.  Whether Mr. Resnick had not heard of a CPS seizure two months before trial is immaterial given the record demonstrates Mr. Resnick educated himself before trial about Petitioner's asserted CPS disorder.  Mr. Resnick presented Petitioner's alleged CPS disorder as the cornerstone of Petitioner's defense.  Consistent with the Court's rulings that there were no trial errors of constitutional

magnitude with respect to the insanity defense, the automatism issue, or the burden of proof jury instruction, Mr. Resnick was not ineffective as Petitioner's trial counsel as a result of failing to advance objections on these issues. Mr. Resnick's representation of Petitioner at trial did not deny Petitioner a fair trial. *Strickland*, 466 U.S. at 667.

Mr. Plunkett's and Mr. Resnick's representation of Petitioner did not so undermine the state court proceedings and jury verdict as to have rendered an unreliable and unjust result. *McQueen*, 99 F.3d at 1311-12. Petitioner is not entitled to habeas relief on his claims of ineffective assistance of counsel.

### E. Sentencing Claim

Petitioner argues that the trial court erred by imposing a significant increase in his sentence (i.e., 25 points under the Michigan Sentencing Guidelines) by finding a "continuing pattern of criminal behavior" in the multiple offenses perpetrated by Petitioner on the evening of Ms. Russell's assault. Petitioner claims that the issue should have been decided by the jury and not unilaterally and arbitrarily by the trial court. Petitoner reasons that a judge's findings can significantly increase the sentence beyond what the sentence would have been based upon the jury's verdict. Petitioner contends that the state trial judge violated his constitutional right to a trial by jury by using factors to score the sentencing guidelines which were based on facts that were not submitted to the jury and proven beyond a reasonable doubt.

The Michigan Court of Appeals rejected this argument.

And regarding OV 13, continuing pattern of criminal behavior, the evidence clearly indicated that defendant committed three or more crimes against the victim within a five year period, i.e., the sentencing offenses. See MCL 777.43. Each forcible sexual penetration of the victim resulted in a separate conviction pursuant to the plain language of the statute and relevant case law. MCL 750.520b; *People v. Dowdy,* 148 Mich. App. 517, 521; 384 N.W.2d 820 (1986) (legislature intended to punish each criminal sexual penetration

separately).  Therefore, the trial court did not abuse its discretion in counting each offense as part of defendant's pattern of criminal behavior and scoring OV 13 at twenty-five points . . . [D]efendant's sentence is within the guidelines range and this issue is without merit.

*Haskell,* 2005 WL 14899480, *8.  This issue has been exhausted within Petitioner's appeal brief to the Michigan Court of Appeals as Issue "I" and within his application for leave to appeal filed with the Michigan Supreme Court as Issue "I."  The Court proceeds to address the merits of Petitioner's claim.

## 1.  State Law Claim

Questions of state sentencing law, and the scoring of state sentencing guidelines in particular, are not cognizable on federal habeas corpus review. *Miller v. Vasquez,* 868 F.2d 1116, 1118-19 (9th Cir. 1989); *Long v. Stovall,* 450 F.Supp.2d 746, 754 (E.D. Mich. 2006).   As succinctly explained by the Sixth Circuit, "[a] state court's alleged misinterpretation of state sentencing guidelines and crediting status is a matter . . . of state concern only." *Howard v. White,* 76 Fed. Appx. 52, 53 (6th Cir. 2003)*, citing Travis v. Lockhart,* 925 F.2d 1095, 1097 (8th Cir. 1991); *Branan v. Booth,* 861 F.2d 1507, 1508 (11th Cir. 1988).  "[F]ederal habeas corpus relief does not lie for errors of state law . . . ." *Lewis v. Jeffers,* 497 U.S. 764, 780 (1990).  "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle,* 502 U.S. at 68. This claim does not merit habeas relief.

## 2.  Due Process Claim

A sentence violates due process if it is based on "misinformation of constitutional magnitude[,]" *Roberts v. United States,* 445 U.S. 552, 556 (1980), or "extensively and materially false" information, which the defendant had no opportunity to correct. *Townsend v. Burke,* 334 U.S. 736, 741 (1948).  Petitioner disputes Offense Variable 13, which

requires an assessment of whether the defendant engaged in a continuing pattern of felonious criminal activity on three or more occasions. Petitioner was bound over to the circuit court on seven counts of criminal activity, six of which involved criminal sexual conduct. (PE Tr., at 55-56). The evidence supporting these charges was sufficient for the trial court to conclude that Petitioner engaged in a pattern of felonious criminal activity involving three or more crimes. This Court finds that Petitioner was not sentenced on the basis of "extensively and materially false" information, which he had no opportunity to correct. *Townsend,* 334 U.S. at 741. Petitioner's constitutional right to due process was not violated by the trial court's scoring of the state sentencing guidelines. *Id.*; *Roberts*, 445 U.S. at 556.

### 3. *Blakely v. Washington* Claim

The Supreme Court "has repeatedly held that, under the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence." *Cunningham v. California,* 549 U.S. 270, 127 S.Ct. 856, 863-64, 166 L.Ed.2d 856 (2007). "[T]he Federal Constitution's jury-trial guarantee proscribes a sentencing scheme that allows a judge to impose a sentence above the statutory maximum based on a fact, other than a prior conviction, not found by a jury or admitted by the defendant." *Id.* at 860.

Petitioner relies upon *Blakely v. Washington,* 542 U.S. 296 (2004), which held that, other than the fact of a defendant's prior conviction, any fact that increases or enhances a penalty for a crime beyond the prescribed statutory maximum for the offense must be submitted to the jury and proven beyond a reasonable doubt. *Id.* at 301, citing *Apprendi v. New Jersey,* 530 U.S. 466, 490 (2000).

*Blakely* involved a trial court's departure from Washington's determinate sentencing scheme. Michigan, by contrast, has an indeterminate sentencing system in which the defendant is given a minimum and maximum sentence. The maximum sentence is not determined by the trial judge, but is instead set by law. See *People v. Drohan,* 475 Mich. 140, 160-61 (2006), *cert. den. sub nom, Drohan v. Michigan,*__ U.S. __, 127 S.Ct. 592 (2006); *People v. Claypool,* 470 Mich. 715, 730, n.14; 684 N.W.2d 278 (2004) (both citing, MCL Mich. Comp. Laws §769.8). "[M]ichigan's sentencing guidelines, unlike the Washington guidelines at issue in *Blakely,* create a range within which the trial court must set the minimum sentence." *Drohan,* 475 Mich. at 161. Under Michigan law, only the minimum sentence must presumptively be set within the appropriate sentencing guidelines range. See *People v. Babcock,* 469 Mich. 247, 255, n. 7; 666 N.W.2d 231 (2003), citing Mich. Comp. Laws §769.34(2). Under Michigan law, the trial judge can never exceed the maximum sentence. *Claypool,* 470 Mich. at 730., n. 14.

The decision in *Blakely* has no application to Petitioner's sentence. Indeterminate sentencing  schemes, unlike determinate sentencing schemes, do not infringe on the province of the jury. See *Blakely,* 542 U.S. at 304-05, 308-09. Because *Apprendi* and *Blakely* do not apply to indeterminate sentencing schemes like the one used in Michigan, the trial court's calculation of Petitioner's sentencing guidelines range did not violate his Sixth Amendment right to a jury trial.

The maximum penalty for first-degree criminal sexual conduct in Michigan is life imprisonment. Mich. Comp. Laws §750.520b(2)(a). The maximum penalty for second-degree criminal sexual conduct is fifteen years. Mich. Comp. Laws §750.520c(2)(a). The maximum penalty for aggravated domestic violence is one year. Mich. Comp. Laws §750.81a(2). Because Petitioner's sentences are twelve to thirty years, ten to fifteen years,

and one year, respectively, his sentence is within the statutory maximum for each offense of which he was convicted. Petitioner's *Blakely* claim is without merit. *Stephenson v. Renico,* 280 F.Supp.2d 661, 669 (E.D. Mich. 2003).

## F. Certificate of Appealability

A district court, in its discretion, may decide whether to issue a certificate of appealability ("COA") at the time the court rules on a petition for a writ of habeas corpus or may wait until a notice of appeal is filed to make such a determination. *Castro v. United States,* 310 F.3d 900, 903 (6th Cir. 2002). In deciding to deny the habeas petition, the court has, of course, studied the case record and the relevant law, and concludes that it is presently in the best position to decide whether to issue a COA. *See Id.* at 90 (*quoting, Lyons v. Ohio Adult Parole Auth.,* 105 F.3d 1063, 1072 (6th Cir. 1997) ("[Because] 'a district judge who has just denied a habeas petition . . . will have an intimate knowledge of both the record and the relevant law,' the district judge is, at that point, often best able to determine whether to issue the COA.")

A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c)(2). A petitioner must "show [] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel,* 529 U.S. 473, 484 (2000) (citation omitted).

The court finds that reasonable jurists could disagree with this Court's conclusions that: (1) Petitioner was not denied due process of law under the Fourteenth Amendment on being denied a right to present an automatism defense; (2) Petitioner was not denied effective assistance of counsel with respect to Mr. Plunkett; and (3) Petitioner was not

denied effective assistance of counsel with respect to Mr. Resnick. The remainder of Petitioner's claims are beyond reasonable agreement.

Petitioner has failed to present any claims upon which habeas relief may be granted. The Court grants in part a certificate of appealability.

## V. CONCLUSION

Petitioner has not established that he is in the custody of the State of Michigan in violation of the Constitution or laws of the United States. Accordingly,

IT IS ORDERED that the "Petition for Writ of Habeas Corpus" [Dkt. #1] is hereby DENIED.

IT IS FURTHER ORDERED that a certificate of appealability is hereby GRANTED, IN PART, as to the issues of: (1) whether Petitioner was denied due process of law under the Fourteenth Amendment on being denied a right to present an automatism defense; (2) whether Petitioner was denied effective assistance of counsel with respect to Mr. Plunkett; and (3) whether Petitioner was denied effective assistance of counsel with respect to Mr. Resnick.

SO ORDERED.

Dated: February 26, 2010

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on February 26, 2010, by electronic and/or ordinary mail.

s/Josephine Chaffee
Deputy Clerk